IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ERIK DEMETRIUS WHITE,

    Plaintiff,

v.

KEITH TANULA,

    Defendant.

OPINION and ORDER

14-cv-759-wmc

Plaintiff Erik Demetrius White is proceeding *pro se* on a claim that defendant Keith Tanula used excessive force against him while he was confined at the Douglas County Jail in Superior, Wisconsin. Pending before the court is defendant's motion for summary judgment, which will be denied because there are genuine disputes of material fact regarding whether defendant's use of force was excessive, and defendant has not shown that he is entitled to qualified immunity.

UNDISPUTED FACTS[1]

---

[1] The following facts are material and undisputed unless otherwise noted. The court finds these facts from the parties' proposed findings of fact and responses, as well as the video footage from the incident itself. Defendant argued in his reply materials that the court should disregard certain proposed findings of fact and responses submitted by plaintiff that did not strictly comply with this court's summary judgment procedures. Defendant also faults plaintiff for not submitting a legal brief in opposition to summary judgment. As Magistrate Crocker explained in his August 30, 2016, order denying plaintiff's request for assistance in recruiting counsel, however, this court construes a *pro se* litigant's filings generously. (Dkt. #36.) Magistrate Crocker also specifically explained that plaintiff did not have to file a legal brief in this case, given the well-established legal standard, but needed only to respond to defendant's proposed findings of fact and submit a declaration providing his version of events. Since plaintiff did both of those things, the court has considered plaintiff's version of events so long as it was either supported by the video evidence or his own declaration. Moreover, the court notes that defendant's own evidentiary materials are lacking. Defendant relies primarily on incident reports from various officers who witnessed the incident or aftermath, but has not submitted a declaration or affidavit explaining what was happening in the video or describing his own version of events. Perhaps this was to avoid underscoring the disputed issues of fact, but it does not relieve the court of construing plaintiff's *pro se* submissions generously.

On June 19, 2013, plaintiff Erik White was serving a sentence at the Douglas County Jail in Superior, Wisconsin. Defendant Keith Tanula and another officer, S. Lobermeier, were retrieving dinner trays from inmates. As officer Lobermeier took a tray from the cell next to plaintiff, Tanula approached White's cell and asked him to put his dinner tray on the feeder trap of the door. White was using his toilet at the time and told Tanlua to "hold on." Tanula asked White a second time to put his tray in the feeder trap, and White again failed to comply because, as White asserts, he was using his restroom. Tanula could see White's dinner tray on the cell floor next to the door, so he opened the cell door to retrieve it.

About the same time that Tanula opened the cell door, White flushed his toilet and started walking toward his door, with the intention of picking up his tray to hand it to Tanula. White states that when he leaned over to pick up the tray, Tanula "struck" him twice in the sternum and yelled, "Back the fuck up and get against the wall!" Tanula disputes this, admitting only that he "extended his left arm toward White." Video footage from the cell confirms that Tanula extended his arm, but it is unclear whether he made contact. Unfortunately, the footage does not contain audio. If there was contact, it appears from the video to have been minimal, and no reasonable trier of fact could find it unjustified given White's surprise appearance immediately in front of the door.

Upon entering White's cell, Tanula noticed White had several pictures affixed to his cell walls in violation of Douglas County Jail Rules. Tanula ordered White to remove them. Tanula also reports telling White that he would put the pictures into White's property bin, so that White would be able to retrieve them later, but White denies this.

Regardless, White objected because he'd had the photos on his wall for a week and no other officer had ordered him to take them down. After Tanula repeated his order to take the pictures down, White became agitated and argumentative, although he eventually took down the photos near his toilet. Around the same time, officer Lobermeier overheard the confrontation between White and Tanula and entered the doorway of White's cell.

Tanula then ordered White to remove additional pictures affixed to the cell wall near his bunk, holding out his hand for the pictures. Now angry, While said to officer Lobermeier, "What is this guy's issue?" Lobermeier responded by shrugging and telling White to comply with Tanula's directions. At that point, White told Tanula, "You got what you came for – can you leave my cell?" According to Tanula, White also began acting defensively, pacing and shifting his weight from side to side. White denies shifting his weight, but alleges that Tanula had his hand on his pepper spray in a threatening manner. On this, the video would seem to support White's version more, in that: (1) if White was shifting his weight or pacing at all, it was minimal; and (2) Tanula appears to be placing his hand to his belt where he stored his pepper spray. White then yelled, "that's my fucking family – nobody is getting those," referring to the photographs on the wall. Around this time, Lobermeier radioed for additional officers to assist.

As White neared his bunk, the video next shows that he picked up a black t-shirt and put it around his neck and shoulders. White says he did so to protect his face because Tanula had his hand on his pepper spray, and he believed Tanula was about to spray him. According to White, Tanula proceeded to pepper spray him shortly after he picked up the shirt and then began to punch him repeatedly. White admits that he hit Tanula, but says

3

it was only to defend himself. In contrast, Tanula says he did not even put his hand on his pepper spray until White picked up the shirt and began yelling in an agitated manner. Instead, Tanula claims that White stepped toward him, pulled the shirt off his shoulders and whipped it toward Tanula's face. Tanula says he then put his right hand up to deflect the shirt from his face, and extended his left arm out toward White's body. White then lunged at Tanula and punched him in the face multiple times.

Although the video footage is grainy, Tanula's version of events is again suspect. Rather, the video shows White picking up the shirt *after* Tanula had already placed his hand on or near his pepper spray. Still, it is simply too difficult to determine from the video: (1) whether Tanula deployed the pepper spray before or after White made any movement with the shirt; or (2) whether Tanula or White threw the first punch. When playing in slow-motion, however, it appears Tanula may have swung first.

At some point during the struggle, the parties agree that Tanula used his pepper spray on White, and Lobemeier then ran into the cell to separate White and Tanula. Within seconds, Tanula and Lobemeier were able to get White to the ground. Even so, Tanula says that White continued to struggle, which required Tanula to use his body weight to hold down White's legs and arms while Lobemeier handcuffed him. White also disputes this, stating that he did not struggle or resist once on the ground and instead lay down and put his hands behind his back to be cuffed. Moreover, White says that Tanula jumped on his back and pepper sprayed him, even though he was lying docile on the ground. Tanula denies this.

Unfortunately, the video does not resolve these factual disputes; nor does it fully

support Tanula's version of events. From the video, whether White was pepper sprayed while on the ground is hard to discern, although the video does show that Tanula climbed on White's back *after* White was already laying on the ground with his hands behind his back. It is also unclear from the video whether White was struggling at that point or how much pressure Tanula used.

Once handcuffed, Tanula and Lobemeier pulled White to his feet and took him to the hallway. As Tanula was bleeding and Lobermeier had blood on her clothing and gloves, several other officers arrived on the scene to take over the transport of White. Tanula was taken to the local emergency room for medical treatment. (Neither party submitted evidence describing the extent of Tanula's injuries.)

Officers took White to a decontamination area, so he could run water over his face and eyes. After a few minutes, White told officers he was doing better. According to White, he told the officers that nothing would have happened if Tanula had just "t[aken] the tray and not str[uck] him." Documents from the incident report, however, state that White told officers he had been acting to defend himself against Tanula's attempt to take pictures of his family. Officers inspected White for visible injuries, and they did not see any active bleeding, but noticed some abrasions on his face and arms. They notified a nurse. Within an hour, a nurse checked on White and told him to wash the blood with water and gave him two packets of antibiotic ointment to use on any areas of his body that he felt it was necessary to medicate or disinfect.

5

OPINION

Defendant argues he is entitled to summary judgment because: (1) plaintiff cannot show that defendant's use of force was excessive; and (2) defendant is entitled to qualified immunity. Both arguments fail.

I. **Excessive Force**

Because White was already serving a sentence for a domestic violence conviction at the time of the incident, his claim for excessive force is governed by the Eighth Amendment. The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976). To prove that an officer used excessive force in violation of the Eighth Amendment, the plaintiff must submit evidence that the prison official acted "wantonly or, stated another way, 'maliciously and sadistically for the very purpose of causing harm.'" *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). The factors relevant to making this determination include: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321.

In his summary judgment brief, defendant argues that his actions to subdue plaintiff do not constitute excessive force because it is undisputed that plaintiff was failing to

comply with orders and instigated the physical altercation.[2] Were it actually undisputed that plaintiff threatened defendant or instigated a physical altercation -- and defendant responded to neutralize the threat -- defendant would have a strong case for entry of summary judgment in his favor. *See Whitley*, 475 U.S. at 319 ("The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."); *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) ("Custodians must be able to handle, sometimes manhandle, their charges, if a building crammed with disgruntled people who disdain authority (that's how the prisoners came to be there, after all) is to be manageable.").

Based on plaintiff's version of events, however, a jury could reasonably conclude that there was no need for force under all the circumstances here. Although plaintiff was agitated by defendant's demands that he remove pictures, he started to comply by removing some of the pictures. If plaintiff's version of events is believed, defendant pepper sprayed him and punched him for no reason other than being irritated that plaintiff was questioning his orders and not complying quickly enough, then later climbed on plaintiff's back and sprayed him again, after plaintiff had already been subdued, by inference out of anger or spite.

---

[2] Defendant makes an undeveloped argument that his use of force was reasonable given plaintiff's prior history of problems at the jail. This argument goes nowhere, however, as defendant submitted no declaration stating that he was aware of plaintiff's history or that knowing about plaintiff's history had any impact on his use of force.

7

Importantly, this version of the events is not contradicted by video evidence, and it is in some respects even corroborated. Accordingly, a jury might reasonably infer that defendant had no reason to feel it was necessary to spray plaintiff, punch him, or climb on his back after he was already on the floor. Once that inference is made, the *Whitley* factors tend to point in favor of plaintiff, and summary judgment is inappropriate. *See, e.g., Hill v. Shelander*, 992 F.2d 714, 717 (7th Cir. 1993) ("If the fact-finder were to accept [plaintiff's] story, then [defendant] arguably acted without justification because there would have been no need for [defendant] to physically assault [plaintiff] in order to maintain or restore discipline in the cell.").

Even if plaintiff's version of events were credited, defendant argues that he should nevertheless prevail on summary judgment because plaintiff was not injured, but this is also disputed given plaintiff's claim that he suffered cuts and bruises and burning eyes as a result of the incident. Defendant has no pictures or medical records to dispute plaintiff's description of his injuries. Moreover, there is no "significant injury" requirement to sustain an excessive force claim. *Guitron*, 675 F.3d at 1046. Although defendant may argue at trial that a lack of significant injury undermines plaintiff's claim that excessive force was used, that argument does not defeat plaintiff's claim outright.

## II. Qualified Immunity

Finally, defendant argues that he is entitled to qualified immunity on plaintiff's excessive force claim. Qualified immunity applies whenever a government official's actions, even if unconstitutional, did not violate the "clearly established law" at the time.

*Pearson v. Callahan*, 555 U.S. 223, 243 (2009); *Vinning–El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011). Defendant cites several cases in an attempt to show that there was no "clearly established" law that prohibited the use of force under the circumstances here, but none of the cases apply.

"The notion that unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment is not a new or unusual constitutional principle." *Hill*, 992 F.2d at 718 (internal quotations and citations omitted). Because the defendant's intent weighs so heavily on the excessive force standard, if a jury concludes that a plaintiff has met that standard, a prison official cannot then claim that he reasonably believed his actions were lawful. *Id.* ("[I]f the finder of fact were to decide that [defendant] acted with malicious intent, there could be no question that a reasonable prison sergeant should reasonably have known that the conduct described by [plaintiff] violated the Eighth Amendment.")

Here, the facts surrounding the incident are in dispute. When those facts are construed in the light most favorable to plaintiff, a reasonable correctional officer should have been on notice at the time of the occurrence that plaintiff's conduct did not justify the sort of force described in his account. Accordingly, defendant's motion for summary judgment fails as a matter of law, and this case shall proceed to trial.

ORDER

IT IS ORDERED that:

1. Defendant Keith Tanula's motion for summary judgment (dkt. #27) is DENIED.

2. The clerk of court is directed to set a status conference with the parties to establish a new trial date in this matter, including if appropriate for the trial to proceed in Eau Claire, Wisconsin.

Entered this 24th day of October, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge